Charles Schwartz & Company, a corporation v. Commissioner.
Charles Schwartz & Co. v. Commissioner
Docket No. 4126.
United States Tax Court
1945 Tax Ct. Memo LEXIS 97; 4 T.C.M. (CCH) 841; T.C.M. (RIA) 45280; August 20, 1945
*97 Bernard W. Vinissky, Esq., 10 S. La Salle St., Chicago 3, Ill., for the petitioner. Carroll Walker, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Finding that the salaries paid by petitioner to its officers in the calendar years 1940 and 1941 were excessive, respondent disallowed deductions of portions thereof and determined deficiencies in income and excess profits taxes as follows: Excess
Year
Income Tax
Profits Tax
1940
$ 860.20
1941
3,765.03
$8,403.13
In this proceeding for a redetermination, the only question is whether the salaries paid the corporate officers were reasonable. Other minor adjustments made by the respondent are not contested, and effect will be given thereto in the recomputation under Rule 50. Findings of Fact Petitioner is a corporation organized under the laws of the State of Illinois, on October 2, 1931, having an authorized capital stock of $50,000, consisting of 500 shares of the par value of $100 each. The sum of $5,000 was paid in at the time of organization. Petitioner's returns for the years 1940 and 1941 were filed with the collector for the first district of Illinois. *98 Petitioner is the successor to a business begun in Chicago by Charles Schwartz about 1900, and continued by him individually for 10 or 11 years. He then had a horse and wagon and was engaged in the buying of sacks and bags from various groceries and factories and selling them to a dealer. In 1912 or 1913, he formed a partnership known as Sklar & Schwartz, which engaged in the buying of used bags from peddlers who collected them from various sources of supply, the processing of some of the bags, and the selling of others. The partnership business, operating in a small store, lasted until 1916 or 1917, at which time it was dissolved and Samuel C. Schwartz, a son of Charles, began to work with his father. Until 1919, father and son continued doing business in the quarters occupied by the old partnership. In that year they moved to a new location, where Charles Schwartz bought the building. At the time of incorporation in 1931, Harold W. Schwartz, another son of Charles, came into the business. From about 1925 to 1929 he had worked part time for the business after school hours and full time during summer vacations, doing shipping, receiving, delivery, processing, office work, etc. *99 From 1931 to 1933 the corporation was engaged in the business of buying and selling all types of used bags and sacks, continuing with the same general method previously employed by Charles Schwartz. In 1933 the idea was conceived of making towels from used bags. In about 1935 the business was moved to its present location. Jack Schwartz, another son of Charles, began work for the company full time in 1933. Prior thereto for several years he had worked part time in the afternoons after school and full time during summer vacations. At some time prior to the taxable years in question, Edward Schwartz, another son of Charles Schwartz, came into the business. During the years 1940 and 1941, towels were the principal product of petitioner's business. Minor products were polishing cloths, painters' drop cloths, wiping cloths, and burlap sugar bags. The towels and the other items were made from old cotton sacks that had been used for flour, feed, sugar, salt, and other products. Petitioner purchased the old bags in carload and truckload lots. Upon the arrival of shipments, the bags were unloaded and vacuum cleaned. From the cleaning room the bags went to the ripping room where the *100 seam threads were removed and the bags laid out in sheets. The next step in the process, which petitioner pioneered and developed, was the washing, de-inking, and bleaching operation, performed by an outside firm on a contract basis. The sheets were then graded and sorted as to size, weight, and quality in petitioner's plant. In making the towels, the sheets were sewn, clipped, and packaged in production and line movement. Some towels were printed and dyed in various colors, the printing and dyeing operations being done by outside plants on contract. Torn portions of the sheets were used for making polishing cloths and precision wiping cloths. Among the machines used in the processing operations in petitioner's plant were vacuum cleaning machines, sewing machines, tying machines, packaging machines, baling machines, carton strapping machines and cellophane wrapping machines. Petitioner is the only concern in the country exclusively engaged in this type of business. The following table shows petitioner's annual net sales from 1931 to 1941, the annual sales of towels from 1933 to 1941, and the net worth at the end of each year from 1931 to 1941: Net
Towel
Net
Year
Sales
Sales
Worth
1931
$ 7,796.68
$ 4,755.46
1932
40,485.99
4,289.53
1933
52,689.28
$ 110.00
5,120.66
1934
88,472.18
2,826.25
7,107.84
1935
152,051.71
10,806.60
9,582.36
1936
258,915.62
154,080.23
14,432.64
1937
326,579.71
158,318.44
29,249.77
1938
451,370.74
221,494.79
44,763.52
1939
522,779.19
297,212.45
62,858.90
1940
605,530.34
395,469.75
74,526.56
1941
875,489.07
560,961.97
107,041.69
*101 In 1933 petitioner had only one sewing machine in its plant, but by 1939 the number had increased to 10; in 1940 to 14; and in 1941 to 24. A baling machine was purchased in 1938, pinking machine and a cloth laying machine in 1939, a cutting machine, a tying machine, and an additional vacuum cleaning machine in 1940, and a cellophane wrapping machine in 1941. The monthly average of the number of petitioner's employees increased from 52.8 persons in 1939 to 68.5 in 1940, and to 98.5 in 1941. Petitioner's Federal income taxes paid in the years 1938 through 1941 were as follows: 1938
$ 1,287.96
1939
2,427.08
1940
1,527.31
1941
10,131.45
During the years 1940 and 1941, 400 of the 500 shares of authorized capital stock of petitioner were outstanding and held by the five members of the Schwartz family as follows: Percent-
age of
Certi-
Outstanding
ficate
Stockholder
Shares
Shares
27
Charles Schwartz
72
18%
28
Samuel C. Schwartz
204
51%
29
Harold W. Schwartz
68
17%
30
Jack Schwartz
32
8%
31
Edward Schwartz
24
6%
In 1938 and 1939 the corporation had but three officers, Charles Schwartz, Samuel C. *102 Schwartz, and Harold W. Schwartz. On January 2, 1940, at the annual stockholders' meeting, those three were elected directors of the corporation for that year. The same three were reelected directors for the year 1941 at the annual stockholders' meeting on January 2d of that year. At the annual meeting of the board of directors on January 2, 1940, Charles Schwartz was elected chairman of the board, Samuel C. Schwartz, president of the corporation Harold W. Schwartz, vice-president, Jack Schwartz, treasurer, and Edward Schwartz, secretary. Pursuant to resolutions of the board thereupon adopted, Harold W. Schwartz was appointed director of sales and Edward Schwartz assistant director of sales, and the salaries of the several officers were fixed in the amounts shown in the table set out hereafter. At the annual meeting of the board of directors on January 2, 1941, the same officers were reelected and, pursuant to a resolution adopted by the board, the salaries of the several officers were fixed as shown in the following table of salaries paid to the officers of petitioner from 1938 through 1941: OFFICERS' SALARIES
Charles
Sam
Harold
Jack
Edward
Schwartz
Schwartz
Schwartz
Schwartz
Schwartz
1938
$ 8,000.00
$ 8,000.00
$5,018.49
1939
9,250.00
9,250.00
6,000.00
1940
9,250.00
9,250.00
6,500.00
$4,500.00
$3,500.00
1941
13,500.00
13,500.00
9,500.00
6,500.00
5,000.00
*103 Petitioner's net income, both before and after deducting officers' salaries, in each of the years 1938 through 1941, was as follows: Net Income Before
Net Income After
Deducting Officers'
Officers'
Deducting Officers'
Salaries
Salaries
Salaries
1938
$30,753.90
$21,018.49
$ 9,735.41
1939
42,372.02
24,500.00
17,872.02
1940
42,756.39
33,000.00
9,756.39
1941
79,965.57
48,000.00
31,965.57
At the end of each year from 1939 through 1942, the capital stock, capital surplus, and earned surplus of petitioner were as follows: Capital Stock
Capital Surplus
Earned Surplus
1939
$36,000.00
$26,858.90
1940
40,000.00
34,526.56
1941
44,000.00
$8,000.00
55,041.69
1942
44,000.00
8,000.00
80,965.18
No dividends were declared or paid by petitioner during the years 1938 through 1941. In 1940 and 1941, Charles Schwartz was chairman of the board of directors of petitioner. He was the guiding man in formulating plans and policies for the company and was in full charge of the factory, the manufacture of towels, and the inspection of raw materials as they came in. The hiring and firing of employees were under *104 his jurisdiction. He and his four sons had frequent meetings every day, and after business hours, to formulate plans and policies to pursue. Often he obtained loans for the corporation and personally guaranteed the notes. He had complete charge of the colored girls in the sewing department of the factory, in which there was a large labor turnover. During 1940 and 1941, he worked 10 or 11 hours a day. Samuel C. Schwartz was president and a member of the board of directors of petitioner in the taxable years in question. He was active in the business during those years, as were his father and brothers. His duties were the usual duties pertaining to the office of president - seeing that the policies formulated by the board of directors were carried out efficiently under his supervision. He was in charge of buying used bags throughout the United States. He travelled extensively, keeping in touch with markets throughout the country and making purchases directly from the various sources of supply. The buying of merchandise was a very important part of the business. Under his supervision the corporation purchased from 75 to 100 carloads of bags in 1940 and 1941. Purchases were made from *105 various dealers throughout the territory without seeing the merchandise, and through his years of experience Samuel Schwartz knew with whom to trade and from what sources he could obtain the best quality of merchandise. He also often guaranteed loans made to petitioner. Frequently he spent from three to five hours a night at the laundry where petitioner's washing, de-inking, and bleaching were done, trying to further the program of business by making tests and improving the condition of the workmanship. He worked 9 to 10 hours per day at the business during 1940 and 1941, and in some months 14 to 15 hours per day. Harold W. Schwartz was vice-president, a member of the board of directors, and director of sales of petitioner in the taxable years. From 1929 to 1931 he had experience as buyer and as sales manager for other firms, such as Spiegle-May-Stern Mail Order Co., of Chicago, and Continental Undergarment Co., of Brooklyn. He went to work full time for petitioner upon its incorporation in 1931. In 1940 and 1941 he was salesmanager, advertising manager, and merchandiser for petitioner. The advertising and sales promotion were under his direct supervision, and he was assisted by *106 his brother, Edward Schwartz. The company advertised through direct mail, by enclosures with its merchandise, and through newspapers and magazines. Harold Schwartz sold merchandise to Sears Roebuck, Montgomery Ward, Chicago Mail Order Co., Spiegel, and other chain organizations. Through his efforts, petitioner's products were advertised in catalogs issued by these various mail order houses. Under his direction the sales and advertising efforts resulted in a large "buyer acceptance" for petitioner's products. He worked between 10 and 11 hours per day at the business. In 1940 and 1941 Jack Schwartz was treasurer of petitioner. The records of the company were under his supervision and control. He coordinated all functions, methods of handling, and the routine between the office and the factory. He was, in effect, an office manager. The shipping and receiving department was under his charge. He hired all the men for that department. Merchandise was purchased by the company f.o.b. at point of shipment, and Jack Schwartz made arrangements for the proper carriers, so as to obtain the best freight rates available. He also had charge of purchasing gray goods for the company, and during the *107 taxable years he purchased between 10 and 20 carloads, costing from $6,000 to $10,000 each. All general purchasing of equipment and machinery was under his control. He passed on credits to be allowed customers and made collections of money for the company. He worked about the same number of hours per day as did his father and brothers. Edward Schwartz was petitioner's secretary and assistant director of sales in 1940 and 1941. He assisted his brother, Harold, in the selling, advertising, and merchandising of petitioner's products. He had charge of the salesmen who called on independent stores and of the sales made to such stores. He trained sales help and office help in the handling of sales. He did a large amount of good will work with individual store managers of chain store organizations, promoting and creating a market for petitioner's products, and he did research for the purpose of selling the products to institutions such as hospitals, hotels, railroads, factories, etc. He worked about 10 or 11 hours per day. The growth and success of petitioner's business were due, in large part, to the efforts, the industry, and the experience of the five members of the Schwartz family *108 - its officers during the years 1940 and 1941. The Commissioner disallowed a deduction of $5,000 for officers' salaries in 1940 and a deduction of $15,000 for officers' salaries in 1941 and allowed the following as "reasonable compensation" for the services rendered by each of the five officers in those years: 1940
1941
Charles S. Schwartz
$7,250.00
$8,000.00
Samuel C. Schwartz
8,000.00
9,750.00
Harold W. Schwartz
5,500.00
6,500.00
Jack Schwartz
4,000.00
5,000.00
Edward Schwartz
3,250.00
3,750.00
The salaries paid to the officers of petitioner during 1940 and 1941 were reasonable compensation for services actually rendered by the officers. Opinion ARUNDELL, Judge: The petitioner here contends that the salaries paid to its five officers in the years 1940 and 1941 were reasonable and represented compensation for services actually rendered by them. Respondent has disallowed $5,000 of the aggregate amount of officers' salaries for 1940 and $15,000 for 1941. We think petitioner has sustained its burden of proof that the salaries paid were reasonable. It is apparent from the findings that all five officers were active in the business throughout *109 the taxable years, working 10 or 11 hours per day and often longer. Two of them, Charles Schwartz and Samuel Schwartz, had grown up with the business. All had training and experience peculiarly fitting them for their positions; and the tremendous growth in the business, the increase in net sales, in the equipment used, in the number of employees, and in the net worth were due largely, if not entirely, to their ingenuity, industry, and business acumen. In 1940, after the payment of the officers' salaries, a net income of over $9,000 remained as applicable to an investment of $74,500, and in 1941 the net income remaining after payment of the salaries was over $30,000. Petitioner's net worth in round figures increased from $62,000 in 1939 to $107,000 in 1941. The salaries paid had no relation to the stockholdings of the officers, and it is clear that they were not distributions of profits in disguise. We are, of course, aware of the rule that in the case of close family corporations, salaries paid to officers may be subjected to closer scrutiny, but we think the reasonableness of the salaries paid the officers in this case survives the most careful and critical analysis. It is true *110 that no dividends were declared in the years 1938 through 1941, but where, after payment of salaries, a substantial surplus remained available, the mere fact that the corporation did not choose to pay dividends therefrom does not necessarily require a holding that the salaries were unreasonable. Petitioner's was the only business of its kind in the country. It was developed by the officers, all of whom devoted their entire time and energies toward bringing about its success. See Olympia Veneer Co., Inc., 22 B.T.A. 892; Benz Bros. Co., 20 B.T.A. 1214; Webb & Bocorselski, Inc., 1 B.T.A. 871. Here the directors voted the salaries at the beginning of the year before the year's earnings could be known - a fact which, it would seem, tends to negative any purpose to distribute profits rather than to fix reasonable compensation for services. Under all the circumstances, we see no reason why we should substitute our judgment as to what is reasonable for that of the directors. Klug & Smith Co., 18 B.T.A. 966. We hold that in the recomputation petitioner is entitled to a deduction in the amount of the aggregate salaries paid to its officers *111 in each of the taxable years in question. Decision will be entered under Rule 50.